### STRATFORD DEVELOPMENT CORPORATION v. UNITED STATES.

No. 49485.

United States Court of Claims.
Nov. 7, 1950.

Wendell H. Cloud, Kansas City Mo., for plaintiff.

G. M. Paddack, Washington, D. C., H. G. Morison, Asst. Atty. Gen., and Roy C. Hackley, Jr., Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues the Government for breach of contract. The contract relied upon is a licensing agreement, which the plaintiff as the owner of certain patent rights and of certain scientific and engineering "know-how" necessary to the practical use of the patents, made with the Government.

The United States for the purpose of strengthening the fighting arm of its then ally in World War II, the Union of Socialist Soviet Republics, decided to furnish the Soviet Government information and facilities relating to a petroleum-treatment process on which the plaintiff held patents and possessed the necessary "know-how." To do this, the Government decided to use the facilities of Lend-Lease. It made its licensing agreement with the plaintiff on April 19, 1943. By the agreement the plaintiff licensed the Government to procure and transfer to the Soviet Government the patented equipment mentioned above, and agreed to furnish to the Government for transmittal to the Soviet Government the necessary technical information and "know-how" for the erection and operation of the plant. The Government agreed to pay the plaintiff a lump sum royalty of $25,982.50 for the privilege of the use and operation of the plant by the U. S. S. R. for a period of 18 months beginning with

the commencement of the operation of the plant in Russia. Pertinent parts of the text of the licensing agreement are quoted in Finding 8. Section 6, there quoted, gave the Government an option to extend the license to cover operations of the plant under the Lend-Lease Act, 22 U.S.C.A. § 411 et seq., or any extension of it, "for any extended period within the duration of the hostilities in which the United States is presently engaged." Section 7(b) provided that the license should be terminated upon written notification by the Government to the plaintiff that "the operation of said unit under Lend-Lease agreement has been terminated."

The plant started operation in Russia on September 5, 1946. The 18-month period for which the lump sum royalty payment was made expired, therefore, on March 5, 1948. On March 6, 1947, the Government notified the plaintiff that it elected not to make use of its option to extend the license beyond the original 18-month period. It had theretofore notified the Soviet Government that its right to use the processes in question under Lend-Lease would expire on March 5, 1948.

Returning to the licensing agreement, we find in its Section 7 this provision, quoted in Finding 8: "Upon termination under the provisions of this Section 7 Licensee shall be relieved from its obligation to make any payments hereunder except such payments as are due or have accrued as of the date of said notification, provided, however, that such termination shall in no event relieve Licensee from its obligations under Section 7 of the Lend-Lease Act."

We further find that the agreement was made under the authority of the Lend-Lease Act and provided, in that regard, as follows:

"Whereas, royalty payments are to be made by Licensee during operation of the unit under Lend-Lease, and the matter of subsequent payments, if any, is to be left for determination upon ultimate disposition of the unit after cessation of hostilities in accordance with Section 7 of the Lend-Lease Act and as governed by Article IV of the Mutual Aid Agreement between the governments of the United States and Russia, respectively, dated June 11, 1942 [56 Stat. 1501], which provides that:

"'If as a result of the transfer to the Government of the Union of Soviet Socialist Republics of any defense article or defense information, it becomes necessary for that Government to take any action or make any payment in order fully to protect any of the rights of a citizen of the United States of America who has patent rights in and to any such defense article or information, the Government of the Union of Soviet Socialist Republics will take such action or make such payment when requested to do so by the President of the United States of America.'"

Section 7 of the Lend-Lease Act is as follows: "The Secretary of War, the Secretary of the Navy, and the head of the department or agency shall in all contracts or agreements for the disposition of any defense article or defense information, fully protect the rights of all citizens of the United States who have patent rights in and to any such article or information which is hereby authorized to be disposed of and the payments collected for royalties on such patents shall be paid to the owners and holders of such patents."

The plaintiff has received no royalty payment for the time since March 6, 1948. It claims that, under the provisions of the licensing agreement, the Government is liable to it for further payments. It bases its claim upon the provisions of Section 7 of the Lend-Lease Act, incorporated by reference in Section 7 of the licensing agreement. It says that Section 7 of the Lend-Lease Act required the agent of the Government who made the agreement with the Soviet Union for the transfer of the plant and the disclosure of the pertinent information, "to fully protect" the plaintiff as the owner of the patent right and information. The Soviet Union has, so far, failed to pay the plaintiff, or the United States on the plaintiff's behalf, anything for the use of the plant since March 6, 1948, and there is no reasonable prospect that the Soviet Union will make any such payment in the future. Thus, the plaintiff

says, the breach of contract of the United States with the plaintiff is proved by the fact that the Soviet Union continues to use the plaintiff's patents and processes and does not pay the plaintiff for their use. This proves, the plaintiff says in effect, that our Government breached its statutory and contractual obligation to "fully protect" the plaintiff when it made its deal with the Soviet Union.

What the Government did, in fact, in the direction of protecting the plaintiff, was to require the Soviet Government to enter into Article IV of the Mutual Aid Agreement, which article was quoted and incorporated in the plaintiff's licensing agreement with the Government. That Article, which we have quoted in finding 9, seems to us to amount to a promise by the Soviet Government to compensate the American owner of a patent which the Soviet Government was using, if it continued to use the patent after the United States ceased to pay the patent owner out of Lend-Lease funds. The requirement that the Soviet Government agreed to do this has not, in fact, resulted in the plaintiff's being paid, because the Soviet Government has failed to perform its promise. Did the taking of the promise by our Government at the time the plant was transferred to Russia "fully protect" the plaintiff, as Section 7 of the Lend-Lease Act, incorporated in the plaintiff's licensing agreement, required?

■ In attempting to answer the question just posed, it is necessary to consider what steps Congress might have had in mind, in imposing, in Section 7 of the Lend-Lease Act, upon the officers of the Government the duty to "fully protect" the rights of American patent holders. One effective way to protect them would have been to require the foreign government, the recipient of the Lend-Lease aid, to deposit money or property by way of pledge to secure its performance of its obligation, in this case evidenced by Article IV of the Mutual Aid Agreement between the United States and the Soviet Union. We feel sure that Congress did not contemplate the requirement of the deposit of such se-curity. The purpose of Lend-Lease was to assist our hard-pressed allies by transferring to them things which they could not afford to buy and pay for. They would not, then, have been expected to have resources which they could deposit as a pledge in the United States to secure their performance of their promises of post-war contingent payments.

The plaintiff has not been able to suggest what step it thinks the agents of the Government should have taken; but neglected to take, to protect the plaintiff's rights. It says that the Government's obligation "did not fall far short of indemnification" of the plaintiff for future use of its patents and "know-how." But if the obligation fell short at all of indemnification, what did it contemplate? As to indemnification, we think it is clear that Congress did not intend that. Section 7 relates to the agreements expected to be made between the United States and foreign governments. It says that *in such agreements* the officers of the United States shall fully protect the rights of American patent owners. The protection, then, was to be accomplished in the agreement, or in connection with it. Here, for instance, the pledge which we have mentioned could have been required. But the agreement of our Government, in this case with the Soviet Union, would have been no place to insert a guaranty by the United States that it would, after the termination of Lend-Lease, go on paying royalties to an American patent holder for the use of his patent by the Soviet Union.

■ We conclude, then that Congress did not, by Section 7, require the Government to agree to indemnify the plaintiff against the Soviet Union's default. It required, what was really the only practical thing to do in the circumstances, that the Government take from the Soviet Union its promise to pay the plaintiff royalties if it continued to use its patents after the termination of Lend-Lease. Section 7 was, of course, applicable to all of the countries eligible for Lend-Lease assistance. Congress would naturally have expected that these allies of ours would, after the war,

do what they had agreed to do and would hence have regarded the taking of their promises as a sufficient guaranty of performance.

■ The plaintiff, when it licensed our Government to ship its patented devices and disclose its "know-how" to Russia, was as fully aware as was our Government that there were no means, other than diplomatic, to induce or compel the Soviet Union to do what it agreed to do. The findings show that our Government has done all that could usefully be done by those means, though its efforts have borne no fruit. We conclude that the United States has not breached its contract with the plaintiff and that the plaintiff's petition must be dismissed.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.